**Charles W. and Susan D. DECKER, Darrell E. and Velma J. Lauderdale, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 87–2950.

United States Court of Appeals, Seventh Circuit.

Argued April 19, 1988.

Decided Dec. 1, 1988.

Patrick B. Mathis, Mathis Marifian & Richter, Ltd. Belleville, Ill., for petitioners-appellants.

Michael J. Roach, Appellate Section, Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before FLAUM, MANION, Circuit Judges, and WILL, Senior District Judge.[*]

WILL, Senior District Judge.

Charles W. Decker and Darrell E. Laud-

---

[*] The Honorable Hubert L. Will, Senior Judge of the United States District Court for the Northern District of Illinois, Eastern Division, is sitting by designation.

erdale[1] appeal from the decision of the United States Tax Court disallowing their deductions for depreciation of purchased insurance expirations. We affirm the decision of the Tax Court.

## I. Factual background.

In 1975, appellants Charles W. Decker and Darrell E. Lauderdale formed a corporation known as the Lauderdale Insurance Agency, Ltd. (the "Lauderdale Agency"). The agency was located in Carbondale, Illinois and specialized in commercial lines of property and casualty insurance. In August of 1978, Lauderdale and Decker entered into a partnership agreement to operate an insurance brokerage business which they named Comprehensive Insurance Services ("Comprehensive").

Wm. J. Cunningham, Inc. ("WJC") was a corporation wholly owned by William Cunningham which operated an insurance agency in Pinckneyville, Illinois, thirty-five miles away from Carbondale. Comprehensive entered into negotiations with Cunningham to purchase the insurance expirations of WJC. Insurance expirations are policyholder files which contain the customers' names and addresses and other information including the expiration date of each policy. The expirations are valuable, because they show the most advantageous time to seek a renewal. Although the Lauderdale Agency already did some business in the Pinckneyville area out of its Carbondale location, the purchase of the expirations permitted Comprehensive to expand its market there more quickly and economically.

On August 30, 1978, Comprehensive, WJC, and Cunningham entered into a purchase agreement for the acquisition by Comprehensive of all of WJC's insurance accounts, lists, renewals, insurance records and papers. By agreement, Comprehensive was not entitled to any accounts receivable on or before the date of closing. In addition, Comprehensive was prohibited from using the name "Wm. J. Cunningham,

Inc." Comprehensive, however, was to receive all commission income due WJC after September 1, 1978 except from policies having an effective date, anniversary date or renewal date on or before August 31, 1978. Additionally, WJC and Cunningham covenanted not to compete with Comprehensive in the insurance business within a twenty-five-mile radius of Pinckneyville for five years. WJC and Cunningham also agreed to assist Comprehensive in securing the renewal of transfer of WJC's contracts with all insurance companies for which WJC had been the agent. Finally, WJC and Cunningham assigned to the Lauderdale Agency WJC's lease to its Pinckneyville office.

As required by the purchase agreement, Cunningham entered into an employment agreement to work as an insurance agent and broker for Comprehensive during a three-year period. This agreement was terminated one year later, on August 10, 1979, and was replaced by an agreement that Cunningham serve as an independent contractor for the Lauderdale Agency. During his period of employment by Comprehensive, Cunningham went with appellants to meet with the policyholders whose commercial accounts were due to expire in order to solicit their renewal. In addition to Cunningham, Comprehensive retained WJC's two clerical employees and operated from WJC's office.

Comprehensive began its business in Pinckneyville under the name "Lauderdale Insurance Agency, Ltd." In 1980, the name was changed to "Lauderdale and Decker Insurance, Ltd." The telephone directory listed "Cunningham Insurance" with a reference "See Lauderdale Insurance Agency, Ltd." Lauderdale and Decker Insurance, Ltd. had an advertisement in the yellow pages for approximately one year which included a parenthetic reference "formerly the Cunningham Agency."

During the period from September 1978 through December 1983, 503 of the 1,107 accounts Comprehensive acquired from

---

**1.** Susan D. Decker and Velma J. Lauderdale are parties to this case solely because they filed joint returns with their husbands.

WJC were terminated. During this same period, Comprehensive wrote 240 insurance policies on accounts it acquired from WJC and acquired 339 new accounts. The record does not indicate whether or not any of these new accounts were attributable to referrals from WJC's original customers.

Comprehensive claimed on its 1978 partnership tax return a depreciable basis in the acquired insurance expirations of $287,216. On its returns for 1979 and 1980, Comprehensive claimed a depreciable basis of $258,040. Comprehensive claimed depreciation deductions with respect to the insurance expirations using the straight-line method of depreciation over a seven-year useful life. The IRS issued notices of deficiency to Charles W. and Susan D. Decker and Darrell E. and Velma J. Lauderdale, disallowing these partnership depreciation deductions because the taxpayers had not shown that the expirations were separable from WJC's goodwill, a nondepreciable asset, or that the expirations had a reasonably ascertainable limited useful life.

In the Tax Court, the taxpayers presented the testimony of Decker, a report prepared by a consulting firm, the Middleton Group, and the testimony of a principal of Middleton, William K. Lee, to establish that the insurance expirations in question had value separate from goodwill and an ascertainable limited useful life. Mr. Lee testified that the figures chosed by Comprehensive—a useful life of seven years for the insurance expirations and a value of approximately $250,000—were reasonable estimates. On the basis of this analysis, Mr. Lee concluded that Comprehensive acquired little, if any, good will or going concern value when it purchased WJC's insurance expirations.

The Tax Court disagreed. It found that the taxpayers' purchase of the insurance expirations and the related agreements was in effect the purchase of a going concern and that the expirations were so inextricably linked to goodwill that a limited useful life for them could not be determined apart from goodwill. The Tax Court noted that Comprehensive had acquired WJC's office facilities, clerical staff, principal salesman, and telephone number. The court found that Comprehensive's hiring of Cunningham to solicit renewal business from WJC's policyholders and obtaining from him a covenant not to compete were fatal to the taxpayers' depreciation argument, since those acts showed the taxpayers' intention to acquire a going concern along with its goodwill.

Alternatively, the Tax Court held that, even if the value of the expirations was not inextricably linked to goodwill, the taxpayers had failed to establish that the expirations had a useful life which could be determined with reasonable accuracy. The Tax Court rejected Mr. Lee's testimony as to the useful life of the expirations for several reasons. The Tax Court found that Mr. Lee, in determining that the expirations had a useful life of only seven years, had ignored the subsequent referrals from the acquired accounts. The court pointed out, in addition, several other omissions of facts which it deemed relevant to the value of the expirations and also noted inconsistencies. For example, the court concluded that the fact five years had elapsed since the acquisition of the expirations and only 43% of them had been terminated, was inconsistent with the taxpayers' claim that the expirations had a limited useful life of seven years.

## II. Analysis.

■ Pursuant to Section 167(a) of the Internal Revenue Code[2] and the corresponding treasury regulation,[3] intangible

---

2. Section 167(a) of the Code provides:
   (a) General Rule.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear, and tear
   (1) of property used in the trade or business, or
   (2) of property held for the production of income.

26 U.S.C. § 167(a) (1982).

3. In the case of intangible property, the Treasury Regulations provide:
   *Intangibles.* If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which

assets used in a trade or business or in the production of income can be depreciated, but only if the taxpayer proves that the intangible asset (1) has an ascertainable value separate and distinct from goodwill, and (2) has a limited useful life, the duration of which can be ascertained with reasonable accuracy. *Houston Chronicle Publishing v. United States*, 481 F.2d 1240, 1250 (5th Cir.1973), *cert. denied*, 414 U.S. 1129, 94 S.Ct. 867, 38 L.Ed.2d 754 (1974).

■ Whether a particular intangible asset has a reasonably ascertainable value distinct from goodwill and whether the asset has a limited useful life are questions of fact, which depend on the particular circumstances of the case at hand. *Id.* at 1243; *Panichi v. United States*, 834 F.2d 300, 301 (2d Cir.1987). As a result, the Tax Court's determination that the insurance expirations were "inextricably linked to goodwill" and that Mr. Lee's testimony had not proven an ascertainable limited useful life for the expirations can be overturned only if these findings are clearly erroneous. *Selig v. United States*, 740 F.2d 572, 577 (7th Cir.1984). Under this standard, we must affirm the Tax Court's factual findings, if "the evidence is plausible in light of the record viewed in its entirety ..." *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

■ We find that the record supports the Tax Court's determination that the taxpayers' purchase of WJC's insurance expirations was part of the purchase of a going concern and inseparable from the acquisition of goodwill. Although the taxpayers protest that they intended only to purchase the information in the expirations—the "competitive advantage of being the incumbent insurer," Brief of Appellants at 32— the taxpayers did, in fact, acquire almost every element of the WJC business as a going concern including assets, employees and business location. Goodwill is "the expectancy that 'the old customers will resort to the old place.'" *Winn–Dixie Montgomery, Inc. v. United States*, 444 F.2d 677, 681 (5th Cir.1971) (citations omitted). "[G]oodwill is acquired by the purchaser of a going concern where the 'transfer enables the purchaser to step into the shoes of the seller.'" *Ibid.* (citations omitted). In spite of the taxpayers' arguments to the contrary, their purchase clearly allowed them to step into the shoes of WJC. The only significant distinction between an outright acquisition of the Cunningham Agency and the purchase executed by the taxpayers was the prohibition against the use of the Cunningham name. And in this regard, the yellow page listings for the taxpayers' agency made it possible for the taxpayers even to exploit some of the value inherent in the Cunningham name. The taxpayers argue that the office procedures of the Cunningham agency were replaced by those of Comprehensive and that Comprehensive's retention of the same location and the same clerical personnel had little impact on its success in the Pinckneyville market. The commercial business insurance field, they argue, relies very little on sales to walk-in customers. Notwithstanding these arguments, the entirety of the record supports the Tax Court's conclusion that the taxpayers acquired a going concern.

Two factors about the purchase are particularly significant. First, the taxpayers' acquisition of "a covenant (not to compete) has the function primarily of assuring the purchaser the beneficial enjoyment of the goodwill and the seller's list of expirations." *Marsh & McLennan Inc. v. Comm'r*, 420 F.2d 667, 669 n. 4 (3d Cir. 1969), citing *Thomas v. Comm'r*, 50 T.C. 247, 255 (1968). Second, as part of the purchase agreement, the taxpayers obtained Cunningham's agreement to assist them in retaining his former customers and

---

can be estimated with *reasonable accuracy,* such an intangible asset may be the subject of a depreciation allowance.... An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported view of the taxpayer, the intangible asset has a limited useful life. *No deduction is allowable with respect to good will.*
26 C.F.R. § 1.167(a)–3 (emphasis added) (1988).

then hired him for that purpose. Although the taxpayers argue that they believed during their negotiations for the purchase of the expirations that Cunningham was planning to go to Florida, Brief of Plaintiffs–Appellants at 36, Cunningham did not leave. In fact, the purchase agreement between Comprehensive, Cunningham and WJC required that Cunningham aid the taxpayers in retaining the accounts of WJC which he did. The Tax Court did not err when it relied in part on the continuing affiliation of Cunningham with Comprehensive in concluding that the taxpayers acquired a going concern. Cunningham's assistance was contemplated at the time of purchase and, as the taxpayers admit, Brief of Plaintiffs–Appellants at 14, commercial insurance sales rely much on personal contact.

The taxpayers argue that this case should be governed by the reasoning of the court in *Richard S. Miller & Sons, Inc. v. United States*, 537 F.2d 446, 210 Ct.Cl. 431 (1976). The court in *Miller* found that the taxpayer insurance agency was entitled to depreciate the cost of insurance expirations which it purchased from a competing agency. The court concluded that the primary purpose of the purchase was not to buy an ongoing business, since (1) the taxpayer was already operating as a competitor in the same market; (2) the taxpayer-purchaser did not use the seller's name, location, sales personnel or office procedures; and (3) the taxpayer did not receive cash, uncollected premiums or accounts receivable in the purchase. Because the taxpayer had not acquired a going concern, the court reasoned that "[t]he purchase of the expirations was a substitute for the time and effort [of the taxpayer agency's employees] to develop and place on the books a comparable number of policies for the first time." *Id.* 537 F.2d at 454. The information in the expirations had substantial value apart from any goodwill which was also obtained through the purchase. *See also Panichi v. United States*, 834 F.2d 300, 302 (2d Cir.1987).

Although we agree with the reasoning of the court in *Miller*, we do not believe that the present case is governed by it. Be-

cause the taxpayers, Decker and Lauderdale, moved into the Pinckneyville insurance market by a purchase which retained many elements of the Cunningham Agency as a going concern (including, among others, the right to a portion of the commission income after September 1, 1978), we find that the Tax Court's decision is not clearly erroneous. Unlike the *Miller* case, the Tax Court here concluded that the taxpayers intended to buy a going concern. The evidence supports that conclusion.

The taxpayers also argue that the Tax Court erred in disregarding the evidence presented by their expert to support their estimates of the useful life of the expirations. Since the evidence clearly establishes that the taxpayers acquired a going concern, including its assets, personnel and business location, rather than just the expirations as a separate intangible asset, the useful life of the expirations is irrelevant. It is clear from the variations in the renewals of the expirations, however, that the information obtained in the acquisition did not have a reasonably determinable useful life, the expert's testimony to the contrary notwithstanding.

For all of the foregoing reasons, the decision of the Tax Court is affirmed.