**John W. HOUGH and Louise C. Hough, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 88–3168.

United States Court of Appeals, Seventh Circuit.

Argued April 18, 1989.

Decided Aug. 21, 1989.

---

John W. Hough, Paul D. Weatherhead, Hough, Weatherhead, Kinsella, Chicago, Ill., for petitioners-appellants.

Gary R. Allen, William S. Rose, Jr., Asst. Atty. Gen., David E. Brunori, Dept. of Justice, Tax Div., Appellate Section, Charles S. Casazza, U.S. Tax Court, William F. Nelson, I.R.S., David E. Carmack, Dept. of Justice, Tax Div., Washington, D.C., for respondent-appellee.

Before COFFEY, EASTERBROOK, and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Taxpayers John and Louise Hough claimed a business-related bad debt deduction in their 1978 tax return, pursuant to 26 U.S.C. § 166.[1] The Commissioner of Internal Revenue (Commissioner) disallowed this deduction and, on August 12, 1985, issued a notice of deficiency. The Houghs filed a petition with the United States Tax Court contesting the deficiency determination and alleging that the Internal Revenue Service (IRS) had violated 26 U.S.C. § 7605(b) by performing a prohibited second inspection of their 1978 books of account. The Tax Court found that the taxpayers had not met their burden of proving that there was a second inspection and affirmed the Commissioner's finding that the Houghs' bad debt deduction was not business related. We affirm the decision of the Tax Court.

---

1. Although section 2 of the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085 (1986), redesignated the Internal Revenue Code of 1954 as the Internal Revenue Code of 1986, the events giving rise to this litigation antedate the Tax Reform Act of 1986. Therefore, all references are to the Internal Revenue Code of 1954, as amended.

## I.

### Background

John W. Hough and his wife Louise C. Hough[2] (taxpayers) filed a joint United States Individual Income Tax Return, Form 1040, for each of the years 1978 and 1979. In their 1978 return, the taxpayers declared a business-related bad debt deduction in the amount of $134,306, $93,202 of which was deducted in 1979 as a net business loss carry-forward. Jt. Ex. 3–C. As a result of a Taxpayer Compliance Measurement Program (TCMP) audit of the taxpayers' 1979 return,[3] the Commissioner disallowed this deduction on the ground that it was a nonbusiness debt under 26 U.S.C. § 166.[4] The Commissioner issued a notice of deficiency against the taxpayers, dated August 12, 1985, in the amount of $3869.55 for the calendar year 1978, and $43,615.10 for the calendar year 1979. The taxpayers petitioned the United States Tax Court for a redetermination of these deficiencies. The taxpayers also asserted that the Commissioner improperly had made a second inspection of their 1978 tax return, in viola-

tion of 26 U.S.C. § 7605(b).[5] After a bench trial, the Tax Court ruled against the taxpayers on both issues and, on August 3, 1988, found deficiencies in the amount of $3581.55 and $43,615.10 for the respective calendar years of 1978 and 1979. The taxpayers filed a timely notice of appeal on October 31, 1988. Fed.R.App.P. 13(a).

### A. Facts

The following are the relevant facts as stipulated to by the parties or found by the Tax Court. R.8. On January 20, 1971, John Hough acquired all of the issued and outstanding stock of Mesa Broadcasting Company (Mesa). In 1972, Mesa created a wholly owned subsidiary called KIXX, Inc. On or about October 2, 1972, Mesa acquired the assets of a radio station called KIXX, at a cost of $99,000, and transferred the assets and operating license of this radio station to KIXX, Inc. (KIXX). Of the $99,000 paid, $79,000 was composed of two promissory notes that had been personally guaranteed by Mr. Hough.

---

**2.** Louise Hough is a party to this suit solely by virtue of having filed joint returns with her husband.

**3.** The TCMP "is a research program for measuring and evaluating taxpayer compliance characteristics through specialized audits of about 50,000 to 100,000 individual income tax returns." M. Saltzman, IRS Practice and Procedure ¶ 8.03[1][b] (1981). These audits have a two-fold purpose: "(1) To comprehensively examine the return and business records of the individual taxpayer, and (2) to discover information helpful to the Commissioner in classifying and selecting other returns for audit." *Benjamin v. Commissioner,* 66 T.C. 1084, 1094 (1976), *aff'd on other grounds,* 592 F.2d 1259 (5th Cir.1979).

**4.** Section 166, in pertinent part, provides:
Sec. 166 Bad Debts
(a) General rule—
(1) Wholly worthless debts.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.
. . . .
(b) Amount of deduction.—For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.
. . . .
(d) Nonbusiness debts.—

(1) General rule.—In the case of a taxpayer other than a corporation—
(A) subsections (a) and (c) shall not apply to any nonbusiness debt; and
(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 1 year.
(2) Nonbusiness debt defined.—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—
(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or
(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.
. . . .
26 U.S.C. § 166.

**5.** 26 U.S.C. § 7605(b) provides:
Restrictions on examination of taxpayer.—No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.

Between the years 1974 and 1976, Mr. Hough personally advanced funds to KIXX, primarily for operating costs. These funds were either paid by Mr. Hough for the benefit of KIXX or transferred directly to KIXX. Mr. Hough initially informed the IRS, in a letter dated March 9, 1987, that his dominant motive in making payments to and for the benefit of KIXX was because of his business interest in the corporation. R.8 at 8. In a conference on April 3, 1987, Mr. Hough stated that his "business interests" referred to in the March 9 letter were the prospective ability of KIXX to pay legal and consulting fees and the increase in value of his ownership interest. *Id.*

The aggregate amount of the payments made by Mr. Hough for the benefit of KIXX was $134,306. No promissory notes or corporate minutes reflect or describe the liability of KIXX to Mr. Hough for his payments. Mr. Hough never received any repayment of these funds. In 1975, Mesa and KIXX entered into a purchase agreement to sell the operating assets of radio station KIXX. The purchaser defaulted on his obligations under the purchase agreement. As a consequence, Mr. Hough lost the $134,306.

During the years in question, Mr. Hough was licensed to practice law in the State of Illinois and was actively involved in the practice of law in a Chicago firm. Mr. Hough stipulated that he was neither in the business of lending money nor in the business of selling corporations that he had created, funded, and promoted.[6] For the period between the years 1974 through 1976, Mr. Hough never received compensation as an employee of Mesa or KIXX. Mr. Hough did perform some legal and management consulting for KIXX. However, he stipulated that he never sent bills to either Mesa or KIXX for those services. He also stipulated that there are no records for the years 1974 through 1976 that reflect any payment by KIXX to Mr. Hough or his firm for legal, management, or consulting services, or for out-of-pocket expenses.

## B. Tax Court Opinion

The Tax Court rendered an oral opinion, including findings of fact. The court noted that, although the parties had originally stipulated that the only issue on appeal was whether the $134,306 was a business or nonbusiness debt, the parties had, by consent, also tried the issue of whether the IRS had engaged in a second inspection of the taxpayers' books of account for the year 1978. The court quickly disposed of this latter issue. Noting that section 7605(b) has no bearing on the Commissioner's authority to examine tax records already in his possession or information secured by one of his agents on an initial inspection of a taxpayer's books and that *reopening* of records is not precluded by section 7605(b), the court found that there was no evidence that there was in fact a second *examination.*

Turning to the principal issue, the court made clear, and the parties agreed, that the legal standard to apply was set forth by the Supreme Court in *United States v. Generes,* 405 U.S. 93, 100–03, 92 S.Ct. 827, 831–33, 31 L.Ed.2d 62 (1972). The taxpayers had to prove that Mr. Hough's "dominant motive" in making the loan to KIXX was business related. The court held that Mr. Hough's status as a shareholder of KIXX was not a business motivation within the meaning of the statute. *See Generes,* 405 U.S. at 100, 92 S.Ct. at 831 ("status as a shareholder was a nonbusiness interest"). The court also reviewed all the evidence to ascertain whether it could support Mr. Hough's assertion that he made the loans in order to generate work and attorney's

---

6. Mr. Hough had owned interests in several other broadcasting properties before he purchased KIXX. In 1963 he acquired a 5% interest in a Chicago television station. In 1966 he purchased, for $334, a 6.66% interest in a Berryville, Arkansas radio station that he sold in 1973 for $12,334. In 1966 he purchased, for $940, a 19.7% interest in a Kennett, Missouri radio station that he sold in 1974 for $9120. Mr. Hough never received compensation as an employee of either the Berryville or Kennett radio stations but he asserted that, from the above investments, he derived legal fees and was not required to put in any more money than his original capital investment. R.8 at 7, R.9 at 2–3.

fees from KIXX. The court found that, because KIXX had generated no fees for Mr. Hough, the taxpayers had failed to satisfy their burden of proof and found that Mr. Hough's dominant motive in making the loan was most probably his interest as a shareholder. The court also noted that these loans could not be business-related debts because Mr. Hough was not in the business of making loans. Therefore, the court determined that there were deficiencies in the income tax due for 1978 and 1979.

## II.

### Analysis

On appeal, the taxpayers present essentially two issues. First, whether the Tax Court erred in finding that there was no second inspection of the books of account in violation of 26 U.S.C. § 7605(b). Second, whether the Tax Court erred in its determination that the taxpayers' losses did not qualify as business debts under 26 U.S.C. § 166.

#### A. *Second Inspection of Books of Account*

We turn first to the issue of whether there was a second inspection of the taxpayers' books of account in violation of 26 U.S.C. § 7605(b). "Section 7605(b) was enacted to protect taxpayers from repetitive investigations used by the [IRS] as a means of harassment." *Curtis v. Commissioner*, 84 T.C. 1349, 1352 (1985); *United States v. Powell*, 379 U.S. 48, 54–56, 85 S.Ct. 248, 253–54, 13 L.Ed.2d 112 (1964).

The taxpayers assert that they were audited in 1978 and that the IRS made an improper second inspection of that year after the taxpayers' 1979 return was audited and a deficiency that arose from the 1978 return was found. The Tax Court concluded that there was no evidence that there was in fact a second examination. The Tax Court's factual findings and " '[m]ixed questions of law and fact,' entailing the application of a legal standard to a given factual pattern, are reviewed under the clearly erroneous standard." *Eli Lilly & Co. v. Commissioner*, 856 F.2d 855, 861

(7th Cir.1988) (quoting *Standard Office Bldg. Corp. v. United States*, 819 F.2d 1371, 1374 (7th Cir.1987)). This circuit has applied the clearly erroneous standard in cases involving § 7605(b). *See United States v. Gilpin*, 542 F.2d 38, 41 (7th Cir. 1976) ("we cannot say that the court below abused its discretion in this matter or that its findings were erroneous"); *Reineman v. United States*, 301 F.2d 267, 271 (7th Cir.1962) (trial court's findings were not clearly erroneous). The Tax Court's finding that there was no second inspection of the taxpayers' 1978 books of account is not clearly erroneous, and we therefore affirm the decision of the Tax Court.

The record contains very little evidence on this issue. We have no difficulty concluding that the Tax Court was correct in its determination that the taxpayers had not met their burden of proof. As the Commissioner points out in his brief, it is not entirely clear that there was a first examination of the taxpayers' books and records for 1978. In any event, it certainly is not established that there was a second inspection. Although Mr. Hough testified that the 1979 TCMP audit caused his 1978 tax year to be reopened, he did not indicate that this reopening resulted in a second inspection of his books of account. Indeed, it is not at all clear that such a reinspection was even necessary. The 1979 tax return contained a schedule that provided information about the $134,306 net operating loss that had been taken in the year 1978. As the Tax Court has noted, an inspection of the " 'books of account' would require, at a minimum, that the respondent have access to and physically view [a petitioner's] books and records." *Benjamin v. Commissioner*, 66 T.C. 1084, 1098 (1976), *aff'd on other grounds*, 592 F.2d 1259 (5th Cir.1979); *Grossman* [*v. Commissioner*], 74 T.C. [1147] at 1156. "The law is settled that a 'review of the Form 1040, and accompanying schedules, does not constitute an inspection of a taxpayer's "books of account." ' " *Curtis*, 84 T.C. at 1351 (quoting *Benjamin*, 66 T.C. at 1097). Moreover, the use of information already in the possession of the Commissioner is not an exami-

nation for purposes of section 7605(b). *See United States v. Dawson*, 400 F.2d 194, 200 (2d Cir.1968), *cert. denied*, 393 U.S. 1023, 89 S.Ct. 632, 21 L.Ed.2d 567 (1969); *Tallal v. Commissioner*, 88 T.C. 1192, 1195 (1987); *Benjamin*, 66 T.C. at 1097; *Pleasanton Gravel Co. v. Commissioner*, 64 T.C. 510, 528 (1975), *aff'd on other grounds*, 578 F.2d 827 (9th Cir.1978), *cert. denied*, 439 U.S. 1071, 99 S.Ct. 841, 59 L.Ed.2d 37 (1979); *see also Geurkink v. United States*, 354 F.2d 629, 631 (7th Cir. 1965) (plaintiffs did not demonstrate that a reexamination of their records in the possession of the Commissioner constituted a second inspection).

The Tax Court, as trier of fact, reasonably concluded that there was no second inspection in violation of section 7605(b); its decision certainly is not clearly erroneous.

### B. Bad Debt Deduction

 Section 166 of the Internal Revenue Code of 1954 allows a deduction for debts that become worthless during the taxable year. 26 U.S.C. § 166; *Cole v. Commissioner*, 871 F.2d 64, 66 (7th Cir. 1989). Mr. Hough held $134,306 in debts that became worthless in 1978 when the purchaser of KIXX defaulted on his obligations under the purchase agreement. The question in this case is whether that loss was sustained by Mr. Hough as a business debt or a nonbusiness debt. In *United States v. Generes*, 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972), the Supreme Court set forth the manner in which this determination is made.

In determining whether a bad debt is a business or a nonbusiness obligation, the Regulations focus on the relation the loss bears to the taxpayer's business. If, at the time of worthlessness, that relation is a "proximate" one, the debt qualifies as a business bad debt and the aforemen-

tioned desirable tax consequences then ensue.

*Id.* at 96, 92 S.Ct. at 829. The Court concluded that, "in determining whether a bad debt has a 'proximate' relation to the taxpayer's trade or business, ... the proper measure is that of dominant motivation." 405 U.S. at 103, 92 S.Ct. at 833. The determination of Mr. Hough's dominant motive is a factual inquiry; the burden of proof rests on the taxpayers. *Putoma Corp. v. Commissioner*, 66 T.C. 652, 673 (1976), *aff'd on other grounds*, 601 F.2d 734 (5th Cir.1979); *Smith v. Commissioner*, 60 T.C. 316, 318 (1973); *see also Anderson v. United States*, 555 F.2d 236, 237 (9th Cir.1977) (ultimate issue of whether debt qualifies is a mixed question of law and fact, but basic underlying factual issues, including intent, are questions of fact); *Gustin v. Commissioner*, 412 F.2d 803, 804 (6th Cir.1969) (question of motivation is an issue of fact). We therefore must review the Tax Court's decision under the clearly erroneous standard. *Commissioner v. Duberstein*, 363 U.S. 278, 291, 80 S.Ct. 1190, 1200, 4 L.Ed.2d 1218 (1960); *Cole*, 871 F.2d at 66; *see Decker v. Commissioner*, 864 F.2d 51, 54 (7th Cir.1988); *Eli Lilly*, 856 F.2d at 860–61. This means that we shall affirm the Tax Court's factual findings if the court's "account of the evidence is plausible in light of the record viewed in its entirety." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985); *see Cole*, 871 F.2d at 67; *Decker*, 864 F.2d at 54.

 The Tax Court concluded, after considering all the facts and circumstances, that "it seems most probable that [Mr. Hough's] interest as a shareholder provided the dominant motivation. Petitioner has failed to prove otherwise or satisfy his burden of proof."[7] Tax Court Opinion,

---

**7.** On appeal, the taxpayers argue that the Tax Court erred when it required the taxpayers not only to sustain the burden of proof of dominant motive, but also to convince the Tax Court that the circumstances in the instant case were different than those set forth in a previous Tax Court case, *Hough v. Commissioner*, Tax Court Memo 1986–299. Appellants' Br. at 1–2; R.12 at

6–7. We reject this argument. From the context in which the Tax Court made the above comment, it is clear that it only wanted the taxpayers to distinguish a case that could serve as a controlling precedent. Mr. Hough also seemed to understand the comment in that light; he stated "I suggest we can distinguish it...." R.12 at 7. It is clear that the Tax Court

R.12 at 70. That finding of fact was not clearly erroneous. The factual issue before the Tax Court was well framed and, as the judge noted, the evidence was presented succinctly. In deciding that Mr. Hough's interest as a shareholder was the dominant motive for making the loans—and that the loans were not made in order to generate legal fees from KIXX as a client [8]—the Tax Court had the following evidence before it: (1) that Mr. Hough had acquired all of the assets of Mesa and that KIXX was Mesa's wholly owned subsidiary; (2) that Mr. Hough made loans to KIXX in the amount of $134,306; (3) that there were no promissory notes or corporate records to reflect or describe the liability of KIXX to Mr. Hough; (4) that Mr. Hough stipulated that he never sent bills to either Mesa or KIXX for services that he performed on behalf of KIXX; (5) that no records for the years 1974 through 1976 reflected any funds received by Mr. Hough or his firm that are identifiable as being related to legal, management, or consulting services performed for KIXX; (6) that other radio stations in which Mr. Hough had an interest generated only minimal amounts of income during the relevant period; [9] and (7) that on their 1978 return the taxpayers stated that the loss was a business bad debt "due to taxpayer's considerable time and money in the *radio broadcasting business*." Jt. Ex. 1–A at 3 (emphasis added). Certainly, this evidence supports the Tax Court's determination that Mr. Hough's primary interest in making the loans was to protect his investment. The amounts advanced were totally disproportionate to the legal fee income that reasonably could be generated. *See Gustin*, 412 F.2d at 804 ("taxpayers' services to the corporation as lawyer ... were of such minor significance as to have no proximate relationship to the loans"). Having re-

viewed the record in its entirety, we are convinced that the Tax Court's determination that Mr. Hough's interest as a shareholder provided the dominant motivation is not clearly erroneous.

## CONCLUSION

The record supports the finding of the Tax Court that no second inspection of the taxpayers' 1978 tax return occurred. The record also supports the determination that Mr. Hough's interest as a shareholder was his dominant motive for making the loans to KIXX that resulted in the $134,306 loss. Accordingly, we affirm the decision of the Tax Court.

AFFIRMED.

only required the taxpayers to prove dominant motive.

8. The taxpayers stipulated that they are not in the money lending business. They further stipulated that Mr. Hough "never, at any time in 1974–1976, inclusive, received compensation as an employee of Mesa, KIXX, Inc., KVWO, Inc., KBOA, Inc., or KTHS, Inc." R.8 at 7.

9. During the years in question, Mr. Hough received $25 per month from radio station KTHS, and a retainer of $200 per year from each of radio stations KTMO and KVOA. He received a larger amount from his television station but could not recall the amount. R.12 at 23.