T.C. Memo. 1996-245


UNITED STATES TAX COURT


REZA AND CONNIE M. REZAZADEH, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 15510-94, 6896-95.          Filed May 28, 1996.


Reza Rezazadeh, pro se.

<u>James E. Schacht</u>, for respondent.


MEMORANDUM OPINION


COUVILLION, <u>Special Trial Judge</u>:  These consolidated cases were heard pursuant to section 7443A(b)(3)[1] and Rules 180, 181, and 182.

---

[1]    Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined the following deficiencies in petitioners' Federal income taxes and penalties:

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 1990 | $3,161 | $632 |
| 1991 | 6,003 | 943 |
| 1992 | 5,284 | 288 |

After concessions by the parties,[2] the issues remaining for decision are: (1) Whether petitioners are entitled to a business bad debt deduction for 1989 under section 166(a) for unpaid loans to a corporation in which Reza Rezazadeh (petitioner) was an employee/shareholder and for attorney's fees incurred in attempts to collect the loan; (2) whether petitioners are entitled to deductions under section 162(a)(2) for travel expenses incurred by Connie M. Rezazadeh (Mrs. Rezazadeh) during 1991; (3) whether petitioners' deduction for 1992 under section 162(a) of inventory

---

[2] Petitioners claimed, on their 1990 and 1991 Federal income tax returns, deductions for unreimbursed employee expenses in the amounts of $7,093.04 and $10,274.90, respectively. In the notice of deficiency, respondent disallowed $3,165 and $8,111 of the amounts claimed, respectively. In a stipulation of settled issues (stipulation), petitioners conceded the entire disallowance for 1990 and $6,585.68 of the disallowance for 1991. Accordingly, with respect to the deduction claimed for 1991, $1,525.32 of the disallowance remains at issue, which is issue number (2) above.

On their 1991 return, petitioners also claimed a deduction of $466.25 for sales taxes paid on an automobile. In the notice of deficiency, respondent disallowed the deduction in its entirety. In the stipulation, petitioners conceded this adjustment.

storage space is subject to the provisions of section 280A; and (4) whether petitioners are liable for the accuracy-related penalties under section 6662(a) for negligence or disregard of rules or regulations for the 3 years at issue. The remaining adjustments in the notices of deficiency for 1990 and 1992 relating to the taxable portion of petitioners' Social Security income is computational and will be resolved by the Court's holdings on the contested issues.

Some of the facts were stipulated, and those facts, with the annexed exhibits, are so found and are incorporated herein by reference. Petitioners, husband and wife, were legal residents of Platteville, Wisconsin, at the time their petitions were filed.

Petitioner is highly educated, possessing degrees in aeronautical engineering and European and Islamic laws, a juris doctorate, a master of laws in international law and economics, a doctorate of juridical science in comparative law, and a doctorate of philosophy in political science and economics. Petitioner speaks five languages.

Since 1961, petitioner has been employed, in various political science-related positions, by the University of Wisconsin-Platteville (the University) at Platteville, Wisconsin. During the years 1975 through 1983, petitioner was chairman of the political science department at the University. In 1983,

petitioner relinquished the chairmanship but remained employed as a full-time professor.  In 1993, petitioner retired as professor emeritus.

By the mid-1970's, petitioner was disenchanted with academic life, felt that he was "highly underemployed", and was utilizing only a "small fraction of his knowledge in teaching political science courses."  In 1975, petitioner decided to look for an "executive position" with several international corporations, with the expectation that he could use his multidisciplinary background to achieve higher employment status and a higher salary.  While the corporations petitioner contacted were impressed with his background, petitioner was unable to secure employment because he was approaching the age of 60.  By 1977, petitioner decided to form his own corporation in an effort to achieve his goals.

In March 1977, petitioner and another individual, Peter Takos, Jr. (Mr. Takos), formed International Management and Investment Corp. (the corporation), an Iowa corporation, to find "appropriate properties in the United States for overseas investors".  Investors would be charged commissions and fees for the services rendered.  Petitioner and Mr. Takos contributed $20,000 each as initial corporate capital.  Petitioner was executive vice president and secretary of the corporation, while Mr. Takos served as president and treasurer.

Petitioner and Mr. Takos agreed that the day-to-day management of the corporation would be handled by Mr. Takos, since he was locally based as a real estate agent in Dubuque, Iowa. These duties required only a nominal portion of Mr. Takos' time. Petitioner was responsible for carrying out the basic functions of the corporation. His services to the corporation included: Traveling twice to Europe, in 1977 and 1978, to conduct a market study regarding the aims of the corporation and establishing a process for finding appropriate clients or investors; establishing contacts with reputable real estate agencies throughout the United States toward seeking and selecting appropriate properties; visiting selected properties, making feasibility studies, and preparing a portfolio for sales presentations; traveling to Europe for consultations and sales presentations with selected agents and customers; and resolving a variety of international problems relating to each client, such as visas, immigration, commercial treaties, etc. Petitioner generally worked about 20 hours per week for the corporation during the academic year and 50-60 hours per week during the summer months. Petitioner maintained his employment with the University as a professor.

During petitioner's first trip to Europe in 1977, it became clear that the Europeans would not deal with the corporation unless the corporation established creditworthiness. When the

corporation was unable to borrow from any of the local banks, petitioner loaned $50,000 to the corporation so that the corporation would have adequate working capital and could establish credit. The loan was evidenced by an "investment certificate", dated May 23, 1977, showing an initial maturity date of May 23, 1978, with a right of renewal, and for the payment of interest at 7 percent per annum. Petitioner made two additional advances to the corporation, $11,000 on October 25, 1977, and $50,000 on January 1, 1978, as it became necessary to sustain and expand the corporation's property transactions. Both of these advances were also evidenced by "investment certificates", which provided initial maturity dates of 1 year after the date of the certificate, a renewal option, and interest at 7 percent per annum. In all, petitioner advanced $111,000 to the corporation through the "investment certificates". Petitioner and Mr. Takos decided that, until the corporation was financially able to establish regular salaries for the two officers, each officer would receive, in place of a stated salary, 50 percent of the net proceeds from commissions and fees received annually by the corporation, up to a maximum of $20,000 per year per officer.

From 1977 to 1979, the corporation enjoyed some success. The total commissions and fees received during these 3 years were $8,865, $32,340, and $79,712, respectively. Petitioner received,

as his 50 percent of the net proceeds, $4,000 in 1977, $12,000 in 1978, and $20,000 in 1979.  No payments were made by the corporation on the $111,000 "investment certificates".

Sometime in 1980, upon his return from a European business trip, petitioner discovered that Mr. Takos had sold all of the corporation's inventory of local properties and absconded to the State of Florida with the proceeds and most of the corporate records.  Petitioner filed a shareholder's derivative suit against Mr. Takos on behalf of the corporation.  On October 22, 1984, a State court in Iowa rendered a judgment against Mr. Takos and his wife (judgment debtors) in favor of the corporation for $203,948.42 in actual damages, $125,000 in punitive damages, and reasonable attorney's fees.  Pursuant to Iowa law, a receiver was appointed to collect the assets of the corporation, including the judgment against Mr. Takos and his wife, and to liquidate the corporation.  The receiver soon determined, by January 1985, that there were no assets of the judgment debtors in the State of Iowa, nor did the judgment debtors have any significant assets in Florida on which the judgment could be satisfied.  Furthermore, the attorney in Florida who had been employed to examine the judgment debtors stated:  "I don't believe that further collection efforts will be worthwhile."   In his Application to Terminate Receivership and Final Report, dated January 11, 1985, the receiver reported that there were no corporate assets in the

corporation other than the judgment and that, in his opinion, the judgment was virtually worthless. Upon the receiver's recommendation, the receiver was discharged and the judgment of the corporation was transferred to petitioner in consideration of petitioner's payment of all attorney's fees related to the suit, the receivership, and the collection efforts made in Florida. From 1981 to 1987, petitioner paid a total of $11,682.75 in attorney's fees to the law firm that handled the suit and also served as the receiver.

Once the judgment was transferred to petitioner, he retained the same counsel in Florida to continue efforts to collect the judgment. In 1989, the Florida attorney informed petitioner that the judgment was not collectible because the judgment debtors had no assets. There is no evidence in the record to show that there was ever any likelihood of collection of the judgment between 1985 and 1989. At this point, petitioner was out $122,682.75, consisting of the $111,000 "investment certificates" and the $11,682.75 he spent in attorney's fees to have the judgment transferred to him and to attempt collection against the debtors. Petitioner concluded, in 1989, that the $122,682.75 constituted a worthless business debt. Therefore, beginning in 1989 and through the years at issue, petitioners claimed on their Federal income tax returns, as business bad debts, an amount that would reduce their Federal income tax for the respective years to

nearly zero. More specifically, petitioners deducted $32,000 in 1989, $22,418 in 1990, $28,629.05 in 1991, and $24,340 in 1992. Petitioners intended to continue claiming bad debt deductions on their Federal income tax returns until the deductions equaled the $122,682.75.

Respondent did not audit petitioners' 1989 return. In the notices of deficiency, respondent disallowed the claimed bad debt deductions for tax years 1990 through 1992. Respondent determined that the deductions were not allowable "because it has not been established that you incurred these losses as business bad debts. If it should be determined that you did incur these bad debt losses in the respective years, then you would be entitled to non-business bad debts only." The facts relating to other adjustments that remain at issue are discussed later in this opinion.

The determinations of the Commissioner in a notice of deficiency are presumed correct, and the burden of proof is on the taxpayer to show that the determinations are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

In general, section 166(a) allows a deduction for any debt that becomes worthless during the taxable year. To qualify for a worthless debt deduction, the taxpayer must show that a debtor-creditor relationship was intended between the taxpayer and the debtor, that a genuine debt in fact existed, and that the debt

became worthless within the taxable year. Sec. 1.166-1(c),
Income Tax Regs.; Andrew v. Commissioner, 54 T.C. 239, 244-245
(1970). The Court is satisfied that there was a debtor-creditor
relationship and that the corporation owed a genuine debt to
petitioner.[3]

The first question is the year in which the $122,682.75 debt
became worthless. Respondent contends that the debt became
worthless in 1985. Petitioner contends the debt became worthless
in 1989. The Court agrees with respondent. In 1985, the
corporate receiver reported there were no assets of the judgment
debtors upon which the judgment could be collected and that
collection efforts would not be worthwhile. The receiver was of
the opinion that the judgment was virtually worthless. Based on
the receiver's opinion, the receivership was terminated, and the
judgment was transferred to petitioner. The Court finds that,
when the receiver established, in 1985, that the corporation had
no assets other than the worthless judgment, the debt owing by

---

[3]     At trial, counsel for respondent asserted, for the first
time, that petitioner's advances of $111,000 constituted capital
contributions to the corporation. The Court rejects that
contention. The Court is satisfied that the "investment
certificates" constituted loans and were not capital
contributions. With respect to the $11,682.75 in legal expenses
paid by petitioner, the Court concludes that those expenses were
so closely related to the advances petitioner made to the
corporation that such expenses "assume identical characteristics"
as the $111,000 advances, so that the two components of
petitioner's claimed deductions are accorded identical treatment.
See Blauner v. Commissioner, T.C. Memo. 1967-156; see also Ander
v. Commissioner, 47 T.C. 592 (1967).

the corporation to petitioner also became worthless. At that time, it was clear that the debt to petitioner would never be repaid. Petitioner argues that the debt became worthless in 1989 when the Florida attorney informed him that the judgment was not collectible because of lack of assets held by the judgment debtors. However, petitioner did not present any evidence to demonstrate what circumstances, if any, existed between 1985 and 1989 to suggest that there was any chance of recovering the judgment. Accordingly, the Court holds that the debt of $122,682.75 owed to petitioner became worthless in 1985.

The second question is whether the indebtedness to petitioner was a business or a nonbusiness indebtedness. Section 166 distinguishes between business bad debts and nonbusiness bad debts. Sec. 166(d); sec. 1.166-5(b), Income Tax Regs. Business bad debts may be deducted against ordinary income and are deductible whether such debts become wholly or partially worthless during the year. Nonbusiness bad debts may be deducted only as short-term capital losses and only if the debts become wholly worthless in the year claimed. Sec. 166(d). A bad debt is characterized as business rather than nonbusiness if the debt bears a proximate relationship to the taxpayer's trade or business. Sec. 1.166-5(b), Income Tax Regs. In determining whether such relationship exists, the proper measure is the

taxpayer's dominant motivation; a significant motivation is not sufficient.  United States v. Generes, 405 U.S. 93, 103 (1972).

The relationship between a debt and the taxpayer's trade or business is a question of fact.  B.B. Rider Corp. v. Commissioner, 725 F.2d 945, 948 (3d Cir. 1984), affg. in part and vacating in part T.C. Memo. 1982-98.  In other words, the determination of the taxpayer's dominant motive is a factual one.  Hough v. Commissioner, 882 F.2d 1271, 1276 (7th Cir. 1989), affg. T.C. Memo. 1986-229.  The question of dominant motive is ascertained as of the time the loan or guaranty is made.  Harsha v. United States, 590 F.2d 884, 886 (10th Cir. 1979).  The loss from a direct loan to a corporation or from the guaranty of a loan is evaluated under the same dominant motive standard.  B.B. Rider Corp. v. Commissioner, supra at 948.

When the creditor or guarantor of a corporate debt is a shareholder/investor and also an employee, mixed motives for the loan and guaranty are present, and the critical issue becomes which motive is dominant.  United States v. Generes, supra at 100.  Investing is not a trade or business.  Whipple v. Commissioner, 373 U.S. 193, 202 (1963).  The rewards of investing are "expectative"; that is, the rewards result from appreciation and earnings on the investment rather than from personal effort or labor.  United States v. Generes, supra at 100-101.  One's role or status as an employee is a business interest.  Id. at

101. Its typical nature is the exertion of effort and labor in exchange for a salary. Id. Therefore, in order to show that a loss is created or acquired in connection with a trade or business, the taxpayer must show that the loan was made either to protect the employment of the taxpayer or as part of an established business of financing corporations. Bernstein v. Commissioner, T.C. Memo. 1989-422 (citing Raymond v. United States, 511 F.2d 185, 189 (6th Cir. 1975)).

In determining the dominant business or nonbusiness motive of a shareholder lending money to a corporation in which the shareholder is also an employee, courts look primarily to three objective factors: The amount of the loan with the taxpayer's investment in the corporation, the amount of the taxpayer's after-tax salary, and other sources of gross income available to the taxpayer at the time of the loan. United States v. Generes, supra; Scifo v. Commissioner, 68 T.C. 714, 723 (1977); Shinefeld v. Commissioner, 65 T.C. 1092 (1976). The larger the taxpayer's investment, the smaller his salary, and the larger his other sources of gross income, the more likely the courts are to find a dominant nonbusiness motive for the loan. United States v. Generes, supra.

On this issue, as to whether the debt constituted a business or nonbusiness bad debt, the record is clear that petitioner was not in the business of lending money to corporations. Therefore,

in order to deduct the loans to the corporation as a business bad debt, petitioner had to show that the dominant motive in making the loans was to protect his employment, as opposed to an investment in the corporation.

Petitioner made a significant contribution to the corporation. As a result of his efforts, it appears the corporation was on its way to becoming a successful venture. The total commissions and fees earned by the corporation from 1977 to 1979 were $8,865, $32,340, and $79,712, respectively. While petitioner received, in 1977 and 1978, approximately 50 percent of these net proceeds, in lieu of a stated salary, in 1979, petitioner received only $20,000 as "salary" because petitioner and Mr. Takos decided to limit the amount they received from the corporation to $20,000 each until the corporation was successfully established. The Court does not believe that petitioner would have been able to survive financially on this limited "salary" if petitioner had not maintained his full-time job at the University during the years 1977 to 1979. Considering the limited "salary" petitioner received from the corporation, the fact that petitioner received a full-time salary from the University while the corporation was in business, and the fact that petitioner made a significant initial capital contribution of $20,000 to the corporation, the Court concludes that, at the time petitioner made the loans to the corporation, the dominant

motive in making the loans was to protect petitioner's investment. United States v. Generes, 405 U.S. 93 (1972). While the Court is satisfied that petitioner's ultimate goal was for the corporation to earn sufficient income whereby he could retire from the University and have a higher standard of living, at the time the loans were made, petitioner was in the process of nurturing the corporation. Had petitioner not made the loans to the corporation, the corporation would not have survived, and petitioner's substantial investment of $20,000 would have been at risk. Although petitioner had a significant motive for protecting his employment, the dominant motive was to protect and enhance his investment in the corporation.

Petitioner argued on brief that the $203,948.42 judgment rendered by the Iowa court in favor of the corporation represented a trade or business asset of the corporation, and, since the judgment was transferred to petitioner, the trade or business characteristics of that judgment also transferred to petitioner. Thus, petitioner argues, the "debt" was a business bad debt. The Court rejects that argument. The tax characteristics of the judgment are not before the Court. The tax characteristics of petitioner's advances to the corporation are at issue. In the transfer, petitioner received an asset, a judgment, which unfortunately turned out to have no value. The debt owing to petitioner from the corporation always remained as

a debt, and its characteristic was not changed by the transfer of the judgment to petitioner.

In support of his argument that the debt was a business debt, petitioner cited numerous cases in which advances to corporations by employees and/or shareholder-employees were found to constitute business bad debts:  Fitzpatrick v. Commissioner, T.C. Memo. 1967-1; Litwin v. United States, 67 AFTR 2d 91-1098, 91-1 USTC par. 50,229 (D. Kan. 1991), affd. 983 F.2d 997 (10th Cir. 1993); Baldwin v. Commissioner, T.C. Memo. 1993-433; Trent v. Commissioner, 291 F.2d 669 (2d Cir. 1961), revg. 34 T.C. 910 (1960); Lundgren v. Commissioner, 376 F.2d 623 (9th Cir. 1967), revg. T.C. Memo. 1965-314; Kelson v. United States, 73-2 USTC par. 9565 (C.D. Utah 1973), Stratmore v. United States, 292 F. Supp. 59 (D. N.J. 1968), revd. 420 F.2d 461 (3d Cir. 1970); Jaffe v. Commissioner, T.C. Memo. 1967-215; Litterio v. Commissioner, T.C. Memo. 1992-524, affd. without published opinion 21 F.3d 423 (4th Cir. 1994).  The Court has considered these cases and concludes these cases are not inconsistent with the holding in this case.  The cases cited by petitioner recite the same principles set forth in this opinion:  that a debt will be characterized as a business debt rather than as a nonbusiness debt if the debt bears a proximate relationship to the taxpayer's trade or business and that the determination of such a relationship is a question of fact.  This Court is satisfied that

the facts of this case are distinguishable from the facts of the cases relied on by petitioner.[4]

The second issue relates to travel expenses incurred by Mrs. Rezazadeh during 1991.  Petitioner was scheduled to present, in his capacity as a political science professor at the University, a paper on local government in the nation of Colombia in October 1991 at the Third World Studies 14th National Conference held at the University of Nebraska at Omaha, Nebraska.  Preparing such a paper required extensive research in Bogota, Colombia.  Due to other commitments, petitioner was unable to travel to Bogota to conduct the necessary research.  Petitioner asked his wife, Mrs. Rezazadeh, who is of Colombian origin, to travel to Bogota to do the research for the paper.  Mrs. Rezazadeh has a doctoral degree in psychology (degree).  Having written an extensive dissertation to complete the degree, Mrs. Rezazadeh was knowledgeable of the research process.  Furthermore, being of Colombian origin and having relatives in Bogota, Mrs. Rezazadeh was very familiar with local offices and institutions in Colombia.  Mrs. Rezazadeh traveled to Bogota on May 27, 1991, and returned to the United States on July 25, 1991, for a total travel period of 60 days.

---

[4]    The case of Stratmore v. Commissioner, 292 F. Supp. 59 (D. N.J. 1968), revd. 420 F.2d 461 (3d Cir. 1970), relied on by petitioner on brief, was the opinion of the U.S. District Court that held that the debt in question was a business bad debt. Interestingly, that holding was reversed by the Court of Appeals for the Third Circuit.  Petitioner did not cite nor discuss the Court of Appeals' reversal.

Her research was used by petitioner at the Omaha, Nebraska, conference.

On their 1991 Federal income tax return, petitioners claimed unreimbursed employee business expenses of $1,525.32 for the travel expenses incurred by Mrs. Rezazadeh for her research trip to Bogota. More specifically, the expenses claimed included the standard mileage rate for automobile travel from petitioners' home in Platteville to the airport in Chicago, Illinois, and back to Platteville, the round-trip airfare from Chicago to Bogota, miscellaneous meals and lodgings in Chicago, parking at the Chicago airport, meals in Bogota, and the Bogota Airport departure tax. Expenses for lodging in Bogota were not claimed because Mrs. Rezazadeh stayed with her relatives. In the notice of deficiency, respondent disallowed the claimed employee business expenses, determining that the primary purpose of the trip was for pleasure, not business. At trial, respondent acknowledged that Mrs. Rezazadeh did spend some time doing research while she was in Bogota.

Section 162(a) allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Such deductions include traveling expenses incurred while away from home in the pursuit of a trade or business, including amounts expended for meals and lodging. Sec. 162(a)(2). If travel expenses are incurred for

both business and other purposes, the travel expenses are deductible only if the travel is primarily related to the taxpayer's trade or business.  Sec. 1.162-2(b)(1), Income Tax Regs.  If a trip is primarily personal in nature, the travel expenses are not deductible even if the taxpayer engaged in some business activities at the destination.  Id.  Whether travel is related primarily to the taxpayer's trade or business or is primarily personal is a question of fact.  Sec. 1.162-2(b)(2), Income Tax Regs.  The amount of time during the period of the trip that is spent on personal activity, compared to the amount of time spent on activities directly relating to the taxpayer's trade or business, is an important factor in determining whether the trip is primarily personal.  Id.  The taxpayer must prove that the trip was primarily related to the trade or business.  Rule 142(a).

At trial, petitioners presented evidence indicating that Mrs. Rezazadeh spent 50 of the 60 days she was in Bogota, including weekends and holidays, doing research, which included collecting, studying, organizing, and tabulating over 700 pages of material.  While Mrs. Rezazadeh did spend some time visiting relatives while she was in Bogota, the Court is satisfied that her trip to Bogota was primarily for business and not personal purposes.  Accordingly, petitioners are entitled to deduct those

business-related travel expenses that have been properly substantiated.

Generally, with respect to the substantiation of expenses, if the record provides sufficient evidence that the taxpayer has incurred a deductible expense, but the taxpayer is unable to adequately substantiate the amount of the deduction to which he or she is otherwise entitled, the Court may estimate the amount of such expense and allow the deduction to that extent. Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). However, in the case of travel expenses, including meals and lodging while away from home, section 274(d) overrides the so-called Cohan rule. Sanford v. Commissioner, 50 T.C. 823, 827 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).

Under section 274(d), no deduction may be allowed for expenses incurred for travel on the basis of any approximation or the unsupported testimony of the taxpayer. Section 274(d) imposes stringent substantiation requirements to which taxpayers must strictly adhere. Thus, that section specifically proscribes deductions for travel expenses in the absence of adequate records or sufficient evidence corroborating the taxpayer's own statement. At a minimum, the taxpayer must substantiate: (1) The amount of such expense; (2) the time and place such

expense was incurred; and (3) the business purpose for which such expense was incurred.

At trial, the only evidence petitioners presented was a copy of Mrs. Rezazadeh's round-trip airline ticket to Bogota. The ticket indicated the dates and destination of travel and the $901.28 cost of the round-trip flight. Petitioners have properly substantiated their entitlement to a travel expense deduction for the amount of the flight. With respect to the other expenses claimed, petitioners have not satisfied the strict substantiation requirements of section 274(d) and, therefore, are not entitled to deduct the remaining travel expenses claimed.[5]

With respect to the third issue, petitioner has authored and published several books, conducting this activity in a portion of

---

[5] Sec. 274(c)(1) provides generally that, in the case of an individual who travels outside the United States away from home in pursuit of a trade or business or an activity under sec. 212, no deduction shall be allowed under sec. 162 or sec. 212 for that portion of the expenses of such travel otherwise allowable under such sections that, under regulations prescribed by the Secretary, is not allocable to such trade or business or to such activity. Sec. 274(c)(2) provides certain exceptions to the applicability of sec. 274(c)(1), one of which is where the portion of the time of travel outside the United States away from home that is not attributable to the taxpayer's trade or business or a sec. 212 activity is less than 25 percent of the total time on such travel. In this case, the travel time spent by Mrs. Rezazadeh on activities not attributable to petitioner's trade or business was considerably less than 25 percent of her total travel time. Moreover, the record does not show that any of the expenses incurred by Mrs. Rezazadeh not attributable to petitioner's trade or business would have otherwise been allowable under sec. 162. Consequently, the provisions of sec. 274(c)(1) are not applicable to this issue.

petitioners' personal residence.  On their 1992 Federal income tax return, petitioners filed a Schedule C in which the income and expenses of this activity were reported as a trade or business.  Among the expenses claimed were expenses related to an office in the home in which petitioners claimed one-eighth of the expenses of their home as being attributable to this business activity.  The one eighth portion of the home office expenses claimed were the following:

$218.89  Utilities
 222.54  Property taxes
 360.00  House depreciation
$801.43  Total

Petitioners claimed only $435.53 of this amount as a deduction, pursuant to section 280A(c), which limits the home office deduction to the amount of income from the activity that, in petitioners' case, was $435.53 for 1992.  However, petitioners additionally claimed a deduction of $801.43 that is described on the Schedule C as "Storage of Inventory Cost, one-eighth of the total space, calculated as above."  In the notice of deficiency, respondent did not question petitioners' entitlement to a deduction of expenses for an office in the home but disallowed the $801.43 claimed for "Storage of Inventory Cost" because the claimed storage expenses related to the same business activity, the writing and publishing of books, and was also subject to

section 280A(c).  The substantiation of the amounts claimed is also not at issue.

As previously stated, section 162(a) allows a taxpayer to deduct all the ordinary and necessary expenses paid or incurred in carrying on any trade or business.  Section 280A, in general, denies deductions with respect to the use of a dwelling unit that is used by the taxpayer during the taxable year as a residence. Section 280A(c)(1), however, allows the deduction of expenses allocable to that portion of a dwelling unit that is exclusively used on a regular basis as "the principal place of business" for any trade or business of the taxpayer.  Sec. 280A(c)(1)(A). Furthermore, section 280A(c)(2) allows the deduction of expenses allocable to the portion of the dwelling unit used on a regular basis as a storage unit for the inventory of the taxpayer held for use in the taxpayer's trade or business of selling products at rental or wholesale, but only if the selling unit is the sole fixed location of such trade or business.

Respondent determined, in the notice of deficiency, that section 280A(c)(5) limits the deductibility of the amount claimed for both the home office and inventory storage to the amount of income earned by the activity.  Accordingly, respondent determined that, of the total of $1,602.86 claimed by petitioners on their 1992 return for the home office and inventory storage ($801.43 + $801.43), the deduction is limited to the $435.53

income earned by the activity.  Petitioners contend that, pursuant to Internal Revenue Service Publication 587, Business Use of Your Home, only the deductibility of the portion of the home used as a home office is limited by section 280A(c)(5), and there is no limitation on the deduction for inventory storage. Accordingly, petitioners claim they are entitled to deduct their inventory storage costs regardless of the amount of income generated by the activity during the taxable year.

Section 280A(c)(5) specifically limits the deduction for both an office in the home and for inventory storage to the "gross income derived from such use for the taxable year".  Since petitioners used the home office and inventory storage for the same business activity, petitioners' total deduction for both of these spaces in their residence is limited to $435.53, the income earned from the activity during 1992.

With respect to petitioners' reliance on Publication 587, while the publication is not completely clear with respect to the applicability of the section 280A(c)(5) income limitations to deductions for inventory storage, regardless of the interpretations or conclusions reached by petitioners from this publication, it is well settled that authoritative tax law is contained in statutes, regulations, and judicial decisions and not in informal publications. Zimmerman v. Commissioner, 71 T.C. 367, 371 (1978), affd. without published opinion 614 F.2d 1294

(2d Cir. 1979); Green v. Commissioner, 59 T.C. 456, 458 (1972). Internal Revenue Service Publications, like the one on which petitioners relied, are merely guides published by the Service to aid taxpayers. Dixon v. United States, 381 U.S. 68, 73 (1965). Petitioners may not rely on such publications to the extent the information in them conflicts with the law. Respondent is sustained on this issue.

The final issue for decision is whether petitioners are liable for the section 6662(a) accuracy-related penalties for negligence or disregard of rules or regulations. Section 6662(a) provides for an addition to tax equal to 20 percent of the portion of the underpayment to which the section applies. Under section 6662(c), "'negligence' includes any failure to make a reasonable attempt to comply with the provisions of this title, and the term 'disregard' includes any careless, reckless, or intentional disregard." Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). However, under section 6664(c), the penalty under section 6662(a) shall not be imposed with respect to any portion of an underpayment if it is shown that there was reasonable cause for the underpayment, and the taxpayer acted in good faith.

Respondent determined that, for tax years 1990 and 1991, petitioners were liable for the section 6662(a) penalty with respect to the claimed business bad debt deductions. For tax year 1992, the penalty relates only to unreported taxable Social Security income in the amount of $9,409. With respect to the claimed bad debt deductions for 1990 and 1991, since facts and circumstances determine whether an indebtedness is business or nonbusiness, the Court finds that petitioner, in good faith, believed that the debts were appropriately characterized as business bad debts and that the debts became worthless in 1989. The Court holds, on this record, that petitioners did not claim the bad debt deductions in a negligent manner. Accordingly, with respect to the section 6662(a) penalties for 1990 and 1991, petitioners are sustained.

With respect to the negligence penalty related to the unreported Social Security income for 1992, the Court holds for petitioners. As evidenced by their calculation on the worksheet accompanying their income tax materials, as to the amount of taxable Social Security benefits for 1992, petitioners concluded that the $21,517 in Social Security benefits received by them during 1992 was nontaxable. Upon concluding that none of the Social Security benefits received in 1992 was taxable, petitioners reported, on line 21b of their 1992 return "0.00" as the taxable amount of the Social Security benefits. Petitioners

failed to report on the face page of their tax return the actual amount of Social Security benefits they received that year. Based on their reported income and expenses, petitioners properly calculated that none of the Social Security benefits received in 1992 was taxable. The worksheet, however, is not filed and is not part of the tax return. The Court does not find that petitioners' failure to report on the face of their return the amount of Social Security benefits received constitutes negligence or represents a disregard of rules or regulations. Accordingly, with respect to the penalties for 1992, petitioners are sustained.

Decisions will be entered under Rule 155.